**SCHLAM STONE & DOLAN LLP**

David J. Goldsmith
  Bar No. 03280-1996
Joshua D. Wurtzel *(pro hac vice
  application filed simultaneously)*
Jessica Caterina *(pro hac vice
  application filed simultaneously)*
26 Broadway
New York, New York 10004
Tel.: (212) 344-5400
Email: dgoldsmith@schlamstone.com
Email: jwurtzel@schlamstone.com
Email: jcaterina@schlamstone.com

**MARKUS WILLIAMS YOUNG & HUNSICKER LLC**

Bradley T. Hunsicker *(pro hac vice
  application filed simultaneously)*
2120 Carey Avenue, Suite 101
Cheyenne, Wyoming 82001
Tel.: (307) 778-8178
Email: bhunsicker@markuswilliams.com

Patrick R. Akers *(pro hac vice application
  filed simultaneously)*
1775 Sherman St., Suite 1950
Denver, Colorado 80203
Tel.: (303) 301-3151
Email: pakers@markuswillaims.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RANDY L. ROYAL, as court-appointed receiver for HS GROUP, INC., a Wyoming corporation,<br><br>*Plaintiff,*<br><br>- against -<br><br>PAYFIRST SOLUTIONS INC., a Pennsylvania corporation,<br><br>*Defendant.* | Case No. _1:25-cv-12158 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION, BY ORDER TO SHOW CAUSE, FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT...................................................................................1

STATEMENT OF FACTS ......................................................................................7

    A.    HSG Provides Payment, Intake, Sales, and Marketing Services to Over 5,000 Vietnamese Nail Salons..........................................................................7

    B.    PayFirst Licenses the Zota Software to HSG ...........................................8

    C.    Dinh's Companies Provide Customer-Service Support to HSG Customers and Have "Complete Access" to the Zota Accounts.........................9

    D.    HSG Seeks to Dissolve and the Receiver Is Appointed .........................11

    E.    HSG's Customer-Service Support Is Transferred to Huynh's Companies, But Then Back to Dinh's Companies Again ......................................................11

    F.    PayFirst Cuts Off HSG's and the Current Providers' Complete Access to the Zota Accounts, and Further Purports to Terminate Its License Agreement With HSG as of August 3, 2025........................................................12

ARGUMENT .......................................................................................................16

    I.    THIS COURT SHOULD ENTER A PRELIMINARY INJUNCTION RESTORING COMPLETE ACCESS TO THE ZOTA ACCOUNTS TO HSG AND THE CURRENT PROVIDERS AND PREVENTING PAYFIRST FROM TERMINATING THE ZOTA LICENSE AGREEMENT ....................................16

    A.    The Receiver Is Likely to Succeed on the Merits of His Claims for Breach of the Zota License Agreement and for a Declaratory Judgment and Permanent Injunction ......................................................................................16

    B.    HSG Will Suffer Irreparable Injury Absent Injunctive Relief................23

    C.    The Balance of the Equities Favors Granting Injunctive Relief ............27

    D.    Granting Injunctive Relief Is In The Public Interest ..............................29

    II.    THIS COURT SHOULD ENTER A TEMPORARY RESTRAINING ORDER RESTORING COMPLETE ACCESS TO THE ZOTA ACCOUNTS TO HSG AND THE CURRENT PROVIDERS DURING THE PENDENCY OF THIS MOTION .....................................................................................................31

CONCLUSION ....................................................................................................32

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                  **Page(s)**

*Acteon, Inc. v. Harms*,
    No. 20-cv-14851, 2020 WL 6694411 (D.N.J. 2020) ...........................................31

*American Telephone & Telegraph Company v. Winback & Conserve Program, Inc.*,
    42 F.3d 1421, 1427 n.8 (3d Cir. 1994)....................................................................30

*Amica Mutual Insurance Company v. Fogel*, ...........................................................
    656 F.3d 167 (3d Cir. 2011) ...................................................................................17

*ADP, LLC v. Olson*,
    No. 20-03312, 2020 WL 6305554 (D.N.J. 2020)................................... 24, 30, 33

*Bimbo Bakeries USA, Inc. v. Botticella*,
    613 F.3d 102, 119 (3d Cir. 2010) ..........................................................................31

*Blom ASA v. Pictometry International Corp.*,
    757 F. Supp. 2d 238, 244 (D.N.J. 2010) ....................................................... 26, 33

*Boynes v. Limetree Bay Ventures LLC*,
    110 F.4th 604 (3d Cir. 2024).................................................................................17

*Collins v. Mary Kay, Inc.*,
    874 F.3d 176 (3d Cir. 2017)..................................................................................17

*Duffy v. Charles Schwab & Company, Inc.*,
    123 F. Supp. 2d 802 (D.N.J. 2000) .......................................................................18

*Effects Associates v. Cohen*,
    908 F.2d 555 (9th Cir. 1990)..................................................................................20

*Fluorarnics, Inc. v. Trueba*,
    No. BER-C-408-05, 2005 WL 3455185 (N.J. Super. Ch. Div. 2005).................26

*GCM Partners, LLC v. Hipaaline Limited.*,
    No. 20 C 6401, 2020 WL 6867207 (N.D. Ill. 2020) ........................ 26, 29, 31, 32

*I.A.E., Inc. v. Shaver*,
    74 F.3d 768 (7th Cir. 1996)..................................................................... 18, 20, 21

*Inter City Retread, Inc. v. Michelin Retread Technologies, Inc.*,
   No. 14-1564, 2014 WL 12621593 (D.N.J. 2014).......................................... 24, 30

*iPursa, LLC v. Bank of N.Y. Mellon Corp.*,
   No. 22-cv-00966, 2023 WL 3072686 (D.N.J. 2023)............................................18

*Issa v. School District of Lancaster*,
   847 F.3d 121, 143 (3d Cir. 2017).........................................................................27

*J.O. ex rel. C.O. v. Orange Township Board. of Education*,
   287 F.3d 267, 272 (3d Cir. 2002) ........................................................................32

*Koons v. Reynolds*,
   649 F. Supp. 3d 14, 22 (D.N.J. 2023)..................................................................32

*Legend Biotech USA Inc. v. Liu*,
   No. 23-cv-02965, 2024 WL 919082 (D.N.J. 2024)..............................................30

*Leslie v. Quest Diagnostics, Inc.*,
   No. 17-1590, 2019 WL 4668140 (D.N.J. 2019)...................................................18

*LLC v. Bank of N.Y. Mellon Corp.*,
   No. 22-cv-00966, 2023 WL 3072686 (D.N.J. 2023)............................................18

*MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*,
   952 F.2d 769 (3d Cir. 1991)................................................................................18

*Marino v. Usher*,
   673 F. App'x 125 (3d Cir. 2016)..........................................................................19

*National Reprographics, Inc. v. Strom*,
   621 F. Supp. 2d 204, 229 (D.N.J. 2009) .............................................................27

*Orient Turistik Magazacilik San ve Tic Ltd. STI v. Aytek USA, Inc.*,
   No. 22-4864, 2023 WL 3559049 (D.N.J. 2023)...................................................28

*Peoplestrategy, Inc. v. Lively Emp'r Servs., Inc.*,
   No. 3:20-cv-02640, 2020 WL 7869214 (D.N.J. 2020) .............................. 24, 31

*Quinn v. City of Detroit*,
   23 F. Supp. 2d 741 (E.D. Mich. 1998) ............................................. 19, 20, 21, 22

*Spence-Parker v. Delaware River & Bay Auth.*,
    656 F. Supp. 2d 488, (D.N.J. 2009) ........................................................................17

*S&R Corp. v. Jiffy Lube International, Inc.*,
    968 F.2d 371, 378 (3d Cir. 1992)..............................................................................25

*Student 1 v. Noem*,
    No. 25-2871, 2025 WL 1431186 (D.N.J. 2025)......................................................30

*Sunbelt Rentals, Inc. v. Love*,
    No. 20-17611, 2012 WL 82370 (D.N.J. 2021).........................................................27

*Sysmex Corp. v. Beckman Coulter, Inc.*,
    No. 19-1642, 2022 WL 1786526 (D. Del. 2022) .....................................................20

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*,
    275 F. Supp. 2d 543 (D.N.J. 2003) ..........................................................................20

*Winter v. Natural Resources Defense Council*,
    555 U.S. 7 (2008) ......................................................................................................17

**Rules**

Federal Rules of Civil Procedure 65 ...........................................................................1

Plaintiff Randy L. Royal, as court-appointed receiver (the "**Receiver**") for HS Group, Inc. ("**HSG**"), submits this memorandum of law, along with the Declarations of Huy Dinh, Randy L. Royal, Catheryn Tran, Denise Vu, and Joshua Wurtzel, in support of his emergency motion, under Fed. R. Civ. P. 65 and L. Civ. R. 65.1, by order to show cause, for: (i) a preliminary injunction, during the pendency of this action, (A) requiring defendant PayFirst Solutions Inc. ("**PayFirst**") to restore Complete Access (defined below) to the Zota Accounts (defined below) to HSG and its Current Providers (defined below), and (B) preventing PayFirst from terminating the Zota license agreement; and (ii) a temporary restraining order, during the pendency of this motion, granting the relief set forth in item (i)(A) above.

## PRELIMINARY STATEMENT

HSG provides electronic-payment, customer-intake, sales, and marketing services to its over 5,000 Vietnamese nail-salon customers. It does so by providing custom hardware—such as touch screens, signature pads, and credit-card swipers—to its nail-salon customers, and then programming this hardware with its proprietary software, called Zota. And so, through this HSG-provided hardware and the Zota software, HSG's nail-salon customers process their own customers' transactions. And HSG generates revenue by (i) collecting a small percentage of each credit-card transaction processed on the Zota software; (ii) selling monthly

subscriptions for marketing services through Zota; and (iii) selling hardware, gift cards, and other items, much of which is Zota branded.

As explained below, HSG licenses the Zota software from PayFirst for $136,000 per month. Though HSG and PayFirst never committed their license agreement to writing, their course of conduct over the last six years, as well as PayFirst's own recent, written acknowledgments, establishes an implied-in-fact license agreement. PayFirst does not dispute this.

As part of HSG's providing its customers with access to the Zota software, HSG must also service those customers' accounts. Between 2019 and mid-2024, HSG did so through the use of several customer-service providers affiliated with Huy Dinh—one of HSG's two shareholders. These initial customer-service providers, and HSG, had Complete Access (defined below) to the Zota Accounts (also defined below)—meaning they were able to provide back-office, customer, sales, and technical support to Zota's customers.

In June 2024, HSG switched customer-service providers to companies affiliated with Hip "Scott" Huynh, who is the spouse of HSG's other shareholder and the owner of PayFirst. For years, however, Dinh and Huynh had been at odds about HSG's operations, potential sale, and future prospects. And so, in September 2024, in connection with a voluntary proceeding in Wyoming state court to dissolve HSG, the Receiver was appointed with a mandate to sell HSG's assets.

2

In early 2025, the Receiver became concerned that Huynh's customer-service providers were not maintaining compliance, as required by HSG's bank, with payment-card requirements. And so, on June 1 2025, the Receiver terminated HSG's relationship with Huynh's customer-service providers and re-engaged with Dinh's companies—which were re-established with different names, but which, of 114 employees, currently employ 72 who worked for Dinh's original customer-service providers. Of course, the Receiver has no interest in any disputes between Dinh and Huynh, and his selection of which customer-service providers to use was, and is, based solely on what is in the best interest of HSG.

Upset with this switch, however, Huynh, through PayFirst, retaliated against HSG by, in breach of the license agreement between HSG and PayFirst, (i) denying Complete Access to HSG and its current, Dinh-affiliated customer-service providers; and (ii) stating that PayFirst will terminate its license agreement with HSG as of August 3, 2025.

PayFirst's denial of Complete Access to HSG and its current customer-service providers has prevented HSG from providing any meaningful support to its customers, and is a breach of the implied license agreement. Indeed, the ability to have Complete Access to HSG's own customers' Zota accounts has always been part of HSG's implied-in-fact license agreement with PayFirst, as HSG and its customer-service providers have historically had this access, and HSG's holding a

license to the Zota software would be worthless if HSG could not also sell and service it. PayFirst is unable to provide this customer support itself.

PayFirst's termination of the Zota license agreement, as of August 3, 2025, is also a breach of the implied license agreement, as—under both the parties' implied-in-fact agreement and as a matter of law—this license agreement is irrevocable. And even if it were revocable (it is not), PayFirst would not be permitted to terminate it without providing HSG with enough advance notice to permit HSG to identify alternate software for its customers—which will take at least six months (and likely longer).

In this motion, the Receiver seeks the issuance of a preliminary injunction (i) requiring PayFirst to restore HSG's and its current customer-service providers' Complete Access to the Zota Accounts (all as defined below), and (ii) preventing PayFirst from terminating the Zota license agreement. And as explained below, the Receiver has satisfied the requirements for a preliminary injunction here.

*First*, the Receiver is likely to succeed on the merits of his claim for breach of the Zota license agreement, as well as on his related claims for a permanent injunction and for a declaratory judgment. There is no dispute that HSG and PayFirst have an implied-in-fact license agreement. The evidence also shows that this license agreement includes the ability to have Complete Access to the Zota accounts, and is irrevocable. Thus, PayFirst is in breach of this license agreement

by refusing to give HSG and its current customer-service providers Complete Access, and by purporting to terminate the license agreement as of August 3, 2025.

*Second*, absent injunctive relief, HSG will be irreparably injured.

Indeed, since June 1, 2025—when PayFirst cut off HSG's Complete Access—HSG's current customer-service providers have received over 45,000 customer-support calls, and approximately 2,400 help-desk tickets remain unresolved. Waves of HSG's customers have already cancelled their Zota subscriptions as a result of HSG's inability to service their accounts. And many more will follow in the coming days and weeks, especially as these customers secure an alternative to HSG and Zota.

Further, HSG's sales agents—who are the lifeblood to HSG's efforts to secure new customers and maintain relationships with existing customers—have actively stopped promoting HSG and Zota to new customers. This has prevented HSG from growing its business, and made it all but impossible for the Receiver to find a buyer for HSG's assets—as he has been tasked to do by the Wyoming court. (The Receiver brings this suit here, since PayFirst is located in New Jersey and is not a party to the Wyoming dissolution action.)

Additionally, if PayFirst is permitted to terminate the license agreement on August 3, 2025, HSG's business will disappear overnight. HSG—which helped fund and develop, and is the sole licensee of, the Zota software—relies on the Zota

software. Without it, it has no business. Thus, PayFirst's termination of the license agreement will completely destroy it.

*Third*, the balance of equities favors granting injunctive relief. As explained above, without injunctive relief, HSG's business will be destroyed. But PayFirst will not suffer any harm as a result of the grant of injunctive relief, and to the contrary, will be required to do only what it always committed itself to do.

*Fourth*, granting injunctive relief is in the public interest, since injunctive relief is necessary to permit the Receiver to carry out his court-ordered duties, and because the public interest is served by enforcing valid contracts.

Because of PayFirst's impending August 3, 2025 deadline for the termination of the Zota license agreement, we request that this Court hear, and decide, this motion for a preliminary injunction before then. No TRO on this point is required as long as this Court can act before August 3, 2025,

But we separately seek a TRO requiring PayFirst to immediately restore Complete Access to the Zota accounts to HSG and its current customer-service providers.

This relief cannot wait even a few weeks, because HSG is losing more and more customers every single day—virtually none of which are likely to return after they have replaced Zota with a competitor. And given the small, insular community in which most of HSG's nail-salon customers and sales agents operate, word

spreads, and has spread, quickly—leading to an expected mass exodus of customers as the July 4 holiday approaches and many of HSG's nail-salon customers typically hold large-scale promotions that require extensive sales and marketing support from HSG.

Further, with thousands of unresolved help-desk tickets built up in just the first few weeks of June, if HSG and its current customer-service providers are unable to promptly gain Complete Access, even if this Court later grants a preliminary inunction, they will have an insurmountable hole out of which they must dig—which is almost certain to lead to customers continuing to leave, even after Complete Access is restored.

Thus, without entry of a TRO restoring HSG and its current customer-service providers' Complete Access, HSG is unlikely to survive another few weeks. And so any relief this Court grants on the preliminary-injunction motion may be rendered ineffectual.

## STATEMENT OF FACTS

### A.    HSG Provides Payment, Intake, Sales, and Marketing Services to Over 5,000 Vietnamese Nail Salons

HSG is an independent sales organization (ISO) that provides a suite of services to more than 5,000 Vietnamese nail salons through a combined hardware and software platform called Zota Payment Services ("**Zota**"). Compl. ¶ 2.

Zota provides secure electronic payment, customer intake, sales and marketing, and related services to HSG's nail salon merchants. Compl. ¶ 2. The Zota-branded hardware includes touch-screens, signature pads, and credit card swipers, and runs on Zota's proprietary software, which is an all-in-one, point-of-sale operating system. Compl. ¶ 2.

Customers at the salons use Zota to select and pay for manicures and other nail treatments, and the salons use Zota to manage their businesses, including marketing on websites and social media. Compl. ¶¶ 2, 6; *see* Tran Decl. ¶ 7. HSG recruits nail salons to become Zota merchants through a network of paid independent sales agents. Compl. ¶¶ 34.

HSG generates revenue in three principal ways: (i) collecting a small percentage of each credit-card transaction processed on Zota ("residuals"); (ii) selling monthly subscriptions for marketing services through Zota; and (iii) selling hardware, gift cards, and other peripherals, some of which is Zota-branded. Over the past five months, HSG's Zota revenues have averaged about $2 million per month. Tran Decl. ¶ 4.

### B.    PayFirst Licenses the Zota Software to HSG

HSG was formed in June 2019 and has two stakeholders, Huy Dinh ("**Dinh**") and Hip "Scott" Huynh ("**Huynh**"). Actual ownership of HSG is shared between by Dinh and Kim Sy, who is Huynh's spouse. Compl. ¶ 25. PayFirst,

which is owned by Huynh, claims to own the Zota software. Compl. ¶ 4. HSG

disputes that claim, having helped build the Zota software and having funded its

creation and development.

But regardless of who actually owns the Zota software, there is no dispute

that, at a minimum, HSG holds a license from PayFirst to use and commercialize

the Zota software, in exchange for a license fee of $136,000 per month. Compl. ¶¶

4, 51; Tran Decl. ¶ 6.

Although PayFirst and HSG did not reduce their agreement to writing, their

previously uninterrupted course of conduct over the past six years confirms the

existence of an implied-in-fact license agreement. Compl. ¶ 4. And PayFirst,

through its counsel, has also recently confirmed the existence and terms of this

agreement. *See* June 3, 2025 Termination Email, Compl. ¶ 107, Ex. 3 ("Payfirst is

terminating its relationship with HSG/DPS, and its licensing and support of Zota

platform, and all other proprietary platforms. . . . Payfirst will expect to continue

receiving its fixed fee under the existing arrangement through July 3, 2025 of

$136,500 per month.").

### C.    Dinh's Companies Provide Customer-Service Support to HSG Customers and Have "Complete Access" to the Zota Accounts

Between September of 2019 and June 2024, Dinh had responsibility for

providing back-office, customer, sales, and technical support for Zota through two

overseas companies he owned, TNHH Global Liaison and Square Block Corp. (together, the "**Initial Providers**"). Compl. ¶¶ 37, 38; Dinh Decl. ¶ 4.

Throughout this period, the Initial Providers had Complete Access (defined below) to the Zota Accounts (defined below). Compl. ¶¶ 39; Dinh Decl. ¶ 5. "**Complete Access**" means the level of access identified on Exhibit 1 to the Complaint, in the column titled "Requested Access," for each of the Zota Accounts. *Id*. The "**Zota Accounts**" means the accounts identified on Exhibit 1 to the Complaint.

Complete Access to the Zota Accounts is necessary to provide back-office, customer, sales, and technical support to Zota's operations, which includes processing merchant agreements, creating databases, training merchants, and resolving support tickets to be addressed by Zota's help desk. Compl. ¶ 40. Importantly, however, Complete Access does *not* provide users any access to the Zota software's underlying source code or other IP elements. Dinh Decl. ¶ 16.

Without Complete Access, the Current Providers cannot onboard new salon merchants or create new profiles, cannot update information on current merchants, cannot address or resolve billing issues, cannot access merchants' licenses, and cannot address or resolve issues of missing licenses, among other things. Compl. ¶ 7; Dinh Decl. ¶¶ 17-20 & Ex. 2 (identifying issues relating to lack of Complete Access).

### D.    HSG Seeks to Dissolve and the Receiver Is Appointed

In March 2022, various disputes arose between Dinh and Huynh concerning Zota's operations, potential sale, and future prospects. In May 2024, Dinh filed a voluntary petition of dissolution of HSG in Wyoming State Court, and in September 2024, Dinh and HSG agreed to voluntarily dissolve HSG and stipulated to the appointment of the Receiver as receiver. Compl. ¶¶ 60. The Receivership Order, issued in January 2025, directs the Receiver to manage an orderly sale of HSG's assets, including its license with PayFirst and other Zota-related assets, and ultimately wind-down HSG.

### E.    HSG's Customer-Service Support Is Transferred to Huynh's Companies, But Then Back to Dinh's Companies Again

In June 2024, HSG transferred its customer-support functions from the Initial Providers to two Huynh-affiliated companies, Advance Solutions Technology Co., Ltd. ("**AST**") and WISE ("**WISE**"). Compl. ¶ 64; Dinh Decl. ¶ 11. But in early 2025, the Receiver became concerned that AST and WISE were not maintaining the compliance required by the payment-card industry as mandated by HSG's bank, including the safeguarding of sensitive financial information. Compl. ¶ 67.

Thus, the Receiver terminated HSG's relationship with them. And in June 2025, the Receiver signed agreements with the Initial Providers, which Dinh had re-established as TNHH Blue Sapphire and OneSource Global Services OPC

11

(together, the "**Current Providers**"). Compl. ¶ 69. The Current Providers employed most of the same people as the Initial Providers—with 72 of the 114 employees currently working for the Current Providers having also previously worked for the Initial Providers. Compl. ¶ 70; Dinh Decl. ¶ 12.

**F.    PayFirst Cuts Off HSG's and the Current Providers' Complete Access to the Zota Accounts, and Further Purports to Terminate Its License Agreement With HSG as of August 3, 2025**

Displeased with the Receiver's decision to switch from AST and WISE to the Current Providers, PayFirst has taken steps to gain control of the Zota platform and the network of salon merchants, and put HSG out of business.

*First*, in late May of 2025, PayFirst arbitrarily rejected the Receiver's request to give the Current Providers, as HSG's agents, Complete Access to the Zota accounts—the same level of access that the Initial Providers had from the outset. PayFirst's denial of Complete Access has caused, and is continuing to cause, severe disruption to HSG and its network of salon merchants. Compl. ¶¶ 77-78. Without Complete Access (and the requested injunctive relied that will restore Complete Access), HSG is disabled from servicing or supporting (and thus from retaining) its thousands of salon merchants, and is similarly unable to expand its business by onboarding new merchants. Compl. ¶ 7; Dinh Decl. ¶ 19.

Indeed, without Complete Access, the Current Providers cannot input new salon merchants or create new profiles, update existing merchants' information,

resolve billing issues, or access licenses or resolve missing licenses. The Current Providers also cannot post any social media content, create websites, manage or update content on their existing websites, run search engine optimization, or provide any other marketing services. Dinh Decl. ¶ 22 & Ex. 2 (list of issues related to lack of Complete Access to Zota portals); Compl. ¶¶ 83, 85, 86.

These issues have manifested themselves in an extraordinary volume of complaints and calls from merchants and sales agents. For example, on May 1, 2025, there were 2,388 tickets requiring resolution. Dinh. Decl. ¶ 25. Moreover, between June 1 and June 19, 2025, 195 merchants have asked to cancel their Zota subscriptions or otherwise cease using Zota. *Id.* ¶ at 32.

Complete Access, moreover, is especially critical during the summer months, when HSG's salon merchants typically have large-scale July 4 Holiday promotions that require extensive sales and marketing support from the Current Providers. Without Complete Access, the Current Providers cannot provide the necessary support to merchants during the critical summer period. Dinh Decl. ¶ 34.

Further, the evidence shows that customer support for Zota has "drastically decreased" over the past several weeks. Vu Decl. ¶ 5. Indeed, HSG's sales agents—responsible for recruiting HSG's salon customers—have witnessed Zota's point-of-sale system randomly stop working, and when they call Zota's helpdesk, they are unable to reprogram or replace the terminals or otherwise address the

issues. *Id*. Merchants also are not receiving the marketing services they paid for, like undelivered gift cards that customers use. *Id.* ¶ 5.

Through the Zota platform, HSG's sales agents used to be able to monitor their merchants' sales activities; but that functionality has not existed since early June 2025. *Id.* ¶ 8. Because of all of these problems, sales agents have actively stopped promoting Zota to potential merchants, because potential merchants have raised concerns with Zota's services and support, and because they have lost confidence in the quality of Zota's services and ability to provide services in the near future. *Id.* ¶ 9.

*Second*, PayFirst is interfering with HSG's back-office, customer, sales, and technical support functions, by diverting to itself (PayFirst) calls from salon merchants and sales agents that were intended to reach the Current Providers. When a salon or sales agent called the Zota helpdesk manned by the Current Providers, PayFirst sent a text message to that caller directing them to dial a different phone number, with a 609 area code reflecting PayFirst's New Jersey location, in order to receive "faster" service. Compl. ¶¶ 90, 91.

*Third*, PayFirst is arbitrarily removing or restricting licenses to the Zota software. Since June 1, 2025, the Current Providers have received numerous inquiries from salon merchants about expired or removed licenses. *Id.* at ¶ 101, 102. But because PayFirst controls the right to remove or restrict licenses, the

14

Current Providers are unable to restore the licenses. *Id.* at ¶ 104. This is so even though the Initial Providers were able to do so. *Id.* at ¶ 105. The salon merchants' lack of access to the Zota software has effectively caused HSG to breach its contracts with them. *Id.* at ¶ 106.

*Fourth*, PayFirst has purported to terminate its license agreement with HSG entirely as of August 3, 2025. Indeed, on June 3, 2025, PayFirst sent a Termination Email to HSG purporting to terminate PayFirst's agreement with HSG to deliver hardware to the merchants, and purporting to terminate HSG's license to use and commercialize the Zota software. In particular, PayFirst intends to terminate "its licensing and support of the Zota platform, and all other proprietary platforms," effective August 3, 2025. Compl. ¶ 122 & Ex. 3. As of August 3, 2025, therefore, all the point-of-sale devices used by HSG's thousands of salon merchants will "go dark" and cease to function. HSG's monthly revenue will drop from $2 million per month to **zero** overnight, and HSG will be out of business. *Id.* at ¶ 6.

PayFirst's actions have frustrated the Receiver's ability to discharge his duties as court-appointed Receiver. While the Receiver has continued a process of marketing HSG for sale, and has received significant interest from potential buyers, no one will buy HSG's assets for any reasonable sum while the severe disruption to HSG's business is ongoing and PayFirst threatens to terminate HSG's Zota license. Compl. ¶¶ 116, 117; Decl. of Randy L. Royal, ¶¶ 14-15.

15

HSG cannot simply replace Zota with a new system for use by its salon merchants. To deploy existing point-of-sale software with similar functionality to the Zota software would take about twenty-six weeks. Dinh Decl. ¶ 38. HSG would have to procure new hardware, update the software, and then deploy the devices to its merchants in seven stage based on the net revenue derived by merchants and the type of hardware used by the merchant. *Id*. To build-out and deploy new software, including training merchants and their employees, would take about two years. *Id.* at ¶ 39.

## ARGUMENT

## I.    THIS COURT SHOULD ENTER A PRELIMINARY INJUNCTION RESTORING COMPLETE ACCESS TO THE ZOTA ACCOUNTS TO HSG AND THE CURRENT PROVIDERS AND PREVENTING PAYFIRST FROM TERMINATING THE ZOTA LICENSE AGREEMENT

A court weighing a preliminary injunction must consider four guideposts: (1) the movant's likelihood of success on the merits; (2) the risk that the movant will suffer irreparable harm absent preliminary relief; (3) the balance of equities; and (4) the public interest. *E.g.*, *Boynes v. Limetree Bay Ventures LLC*, 110 F.4th 604, 609 (3d Cir. 2024) (citing *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)).

### A.    The Receiver Is Likely to Succeed on the Merits of His Claims for Breach of the Zota License Agreement and for a Declaratory Judgment and Permanent Injunction

"In an action based on diversity of citizenship, a federal court generally applies the choice-of-law rules of the jurisdiction in which it sits." *Amica Mut. Ins. Co. v. Fogel,* 656 F.3d 167, 170 (3d Cir. 2011). When a diversity action originates in a New Jersey federal district court, this Court looks to "New Jersey choice-of-law rules." *Collins v. Mary Kay, Inc*., 874 F.3d 176, 183 (3d Cir. 2017).

For contract claims, the law of the "place of negotiating the contract" and/or "the place of performance" will apply. *Spence-Parker v. Delaware River & Bay Auth.*, 656 F. Supp. 2d 488, (D.N.J. 2009).

Because PayFirst is located in New Jersey, and the Zota License Agreement was both negotiated and performed in New Jersey, New Jersey law applies. Compl. ¶¶ 12, 46, 90.

A contract that is implied in fact has the same legal effect as an express contract. *Leslie v. Quest Diagnostics, Inc*., No. 17-1590, 2019 WL 4668140, at *5 (D.N.J. Sept. 25, 2019). The only difference between an implied-in-fact contract and an express contract is that "the parties' agreement has been manifested by conduct instead of [written] words." *Duffy v. Charles Schwab & Co., Inc.*, 123 F. Supp. 2d 802, 817 (D.N.J. 2000).

An implied-in-fact license agreement is based on the concept of an implied-in-fact contract, and may also be implied by conduct. *iPursa, LLC v. Bank of N.Y. Mellon Corp.*, No. 22-cv-00966, 2023 WL 3072686, at *15 (D.N.J. Apr. 25,

17

2023) (noting that a "non-exclusive license may be granted orally and may be implied by conduct") (citing *MacLean Assocs., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.*, 952 F.2d 769, 778-79 (3d Cir. 1991).

When consideration is paid for an implied license, that license is irrevocable, and cannot be revoked without consent of the licensee—or at least without reasonable notice. *See I.A.E., Inc. v. Shaver*, 74 F.3d 768, 772 (7th Cir. 1996) (upholding lower court's rejection of defendant's argument that he revoked an implied license he granted, agreeing that "when, as here, consideration is paid for a license, it is irrevocable"); *Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 750 (E.D. Mich. 1998) (licensor was estopped from terminating implied license agreement without first giving licensee "*reasonable notice* before termination of the implied license").

The evidence here, in the form of the parties' prior conduct, shows that an implied-in-fact license agreement existed between HSG and PayFirst. HSG provides services to nail salons through Zota, including hardware that runs on Zota's software. Compl. ¶ 2. HSG helped build and fund the development of the software, and HSG is the sole user and distributor of the software. *Id*. at ¶ 4. And HSG has historically paid for PayFirst's services and all the expenses associated with the software in exchange for its use, most recently, at a rate of $136,500 month. *Id*. at ¶¶ 4, 51. Further, PayFirst, through its counsel, acknowledged the

Zota license agreement in the Termination Email, stating: "Payfirst is terminating its relationship with HSG/DPS, and its **licensing** and support of Zota platform." Compl. ¶¶ 107, Ex. 3 (emphasis added).

Taken together, the parties' prior conduct, and PayFirst's own admissions, makes clear that an implied-in-fact license agreement exists. *See Marino v. Usher,* 673 F. App'x 125, 130 (3d Cir. 2016) (plaintiff's conduct amounted to an implied license to defendant to use copyrighted work, when plaintiff previously never "sought to enjoin" defendant from using it, and was "excited at its commercial success"); *Sysmex Corp. v. Beckman Coulter, Inc.*, 2022 WL 1786526, at *12 (D. Del. May 26, 2022) (an implied license arose when defendant granted plaintiff the "authority to make and sell the plaintiff's equipment to its customers"); *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 275 F. Supp. 2d 543, 558 (D.N.J. 2003) (license may arise by implication when the creator of a work "intend[s] that defendant copy and distribute it") (citing *Effects Assocs. v. Cohen,* 908 F.2d 555, 558 (9th Cir. 1990)).

HSG's license is irrevocable, because it helped build, and paid for, the creation and development of the Zota Software. Compl. ¶ 4. *See I.A.E.*, 74 F.3d at 772 ("when, as here, consideration is paid for a license, it is irrevocable."). And even if HSG's license were revocable (it's not), then HSG was, at least, entitled to sufficient notice before a termination of the licensing agreement so that it would

19

have time to secure replacement software. *See Quinn*, 23 F. Supp. 2d at 750. This time is necessarily part of the implied-in-fact agreement, because the parties' course of conduct shows that they understood that HSG would continue to have access to Zota's proprietary software.

The evidence also shows that, based on the parties' prior course of conduct, the implied-in-fact license agreement (for which HSG has paid PayFirst $136,500 a month) also includes the ability to use, commercialize, and access Zota. Compl. ¶¶ 4, 38, 50.

From September 2019 until June 2024, HSG and the Initial Providers entered into written agreements to provide back-office, customer, sales, and technical support for Zota. Dinh Decl. ¶ 3. As explained above, as part of this technical support, HSG and the Initial Providers were given a top level of access, known as "Complete Access," to the Zota Accounts. *Id*. at ¶ 5. This level of access is essential to interfacing with HSG's thousands of customers and for potential customers. Compl. ¶ 5. For example, Complete Access enables HSG's merchants to manage customer interactions (e.g., appointments and check-ins), process credit card payments, provide marketing services such as social media postings, and provides merchants with critical helpdesk support. *Id*. at ¶¶ 18-20.

PayFirst is in breach of the implied-in-fact license agreement by withholding Complete Access from HSG and its customer-service providers.

As explained above, despite having provided Complete Access to HSG and the Initial Providers, PayFirst has cut off the Current Providers' Complete Access—thus ensuring that they cannot service the Zota Accounts. Dinh Decl. ¶ 9. PayFirst is also breaching the implied-in-fact license agreement by purporting to terminate the license as of August 3, 2025.

But PayFirst has no right to do either of these things, because HSG's license is irrevocable. *See I.A.E.*, 74 F.3d at 772. And at a minimum HSG is entitled to a reasonable amount of time to transition to a new software. *See Quinn*, 23 F. Supp. 2d at 750. PayFirst's unilateral revocation of the license, with only 30 days' notice (and later 60 days), is unreasonable, because PayFirst knows that HSG cannot replace the software in this short period of time. Compl. ¶ 6. Indeed, as explained by Mr. Dinh in his accompanying declaration, deployment of a software with similar functionality to Zota will take a minimum of 26 weeks to complete. Dinh Decl. ¶ 34.

Thus, even if PayFirst is permitted to revoke its license agreement with HSG (it's not), HSG is entitled to more time to transfer to a new system. *See Quinn*, 23 F. Supp. 2d at 750 (ceasing "use of LMS could not be done immediately upon notice of revocation," and "[w]ithout a period of time to transfer to a new system, the City would have been left helpless, with no way to update cases or access information in the manner necessary to properly monitor cases"). This time is

necessarily part of the implied-in-fact agreement: HSG paid for these services, and is relying on them, and the parties understood that HSG would continue to have access to Zota's proprietary software. Without it, HSG's salon customers literally cannot process payments, which will cause HSG's business to evaporate overnight. Compl. ¶ 6.

Lastly, PayFirst's purported justification for shutting off HSG's access to the Zota Software and HSG's right to commercialize is feigned.

*First*, in its Termination Email, PayFirst's counsel claims to be concerned with the fact that on June 1, 2025, HSG hired "new" customer support providers to help support the Zota platform, questioning their qualifications and noting (ironically) that it "takes months" to implement Zota "to handle thousands of merchants." Compl. Ex. 3, at p. 2. While "new" companies were hired by Mr. Dinh to manage customer support, as explained above, 72 of the 114 employees working for the Current Providers also worked for the Initial Providers providing customer-service support to HSG between September of 2019 and June 2024. Dinh Decl. ¶ 12.

And even if, as PayFirst claims, HSG's "servicers are encountering glitches and failures," how HSG manages and trains its customer-support providers is not PayFirst's concern, nor do HSG's customer service issues have anything to do with PayFirst, which is just the party that licenses the software and which PayFirst

22

acknowledges. Compl. Ex. 3 ("From Payfirst's perspective, this is not at all Payfirst's responsibility."). And in any event, any customer service issues HSG is currently experiencing are the direct result of PayFirst's cutting off its Current Providers' Complete Access to Zota. *See* Vu Decl. ¶¶ 5–8.

*Second*, PayFirst's claim, in the Termination Email, that HSG has purportedly asked for "top" level access to PayFirst's IP is false. All HSG is asking for is for what it has always been entitled to under the parties' agreement: Complete Access to service the Zota Accounts, as explained above, which allows HSG and the Current Providers to, *inter alia*, input new merchants, create new profiles, update existing merchants' information, and resolve billing issues. *See* Dinh Decl. ¶ 13. This access relates solely to the ability to service the Zota Accounts and conduct specific functions in doing so. It does not provide access to any of PayFirst's "IP" or code. By granting HSG Complete Access to Zota, to which it is already entitled, this Court simply will be restoring the status quo.

.    .    .

For all the reasons that the Receiver is likely to succeed on its claim for breach of the Zota license agreement, the Receiver is also likely to succeed on its claims for a permanent injunction and a declaratory judgment.

### B.    <u>HSG Will Suffer Irreparable Injury Absent Injunctive Relief</u>

"Courts have held that impending destruction of a business constitutes immediate irreparable injury sufficient to justify temporary restraints." *Inter City Retread, Inc. v. Michelin Retread Techs., Inc.*, 2014 WL 12621593, at *4 (D.N.J. Apr. 4, 2014) (citing cases). Similarly, "[c]ourts in the Third Circuit and this District have had no difficulty in finding that the loss of business opportunities and goodwill constitutes irreparable harm." *ADP, LLC v. Olson*, 2020 WL 6305554, at *12 (D.N.J. Oct. 28, 2020) (citing cases); *see also Peoplestrategy, Inc. v. Lively Emp'r Servs., Inc.*, 2020 WL 7869214, at *9 (D.N.J. Aug. 28, 2020) ("The Third Circuit has also stated '[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.'") (quoting *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992)). This is because the harm caused by these losses, particularly in combination, does not lend itself to a straightforward calculation of money damages.

This case readily satisfies this standard.

HSG, as detailed in the Statement of Facts above, will suffer irreparable injury through the destruction of its entire business (including any ability to grow the business), continued loss of goodwill and interference in its relationships with its 5,200 salon merchants, and continued injury to its reputation. Compl. ¶¶ 85, 86; 113, 114; Dinh Decl. ¶ 25. In late May of 2025, and finally on June 13, 2025, PayFirst refused the Receiver's request to provide Complete Access to the Zota

24

Accounts to HSG and its Current Providers, notwithstanding the fact that HSG and the Initial Providers had had such Complete Access from the outset. Compl. ¶¶ 77-82.

Without Complete Access, HSG cannot service or support its existing salon merchants, cannot retain such merchants, and cannot expand its business by onboarding new merchants. Compl. ¶¶ 87, 88; Dinh Decl. ¶ 19. The merchants and sales agents have flooded the Current Providers' helpdesks with complaints and calls requiring resolution, and merchants are ending their Zota use and subscriptions. Compl. ¶ 86; Dinh Decl. ¶ 32. Sales agents have lost confidence in Zota and have ceased marketing the product to potential new merchants. Compl. ¶¶ 96, 115; Dinh. Decl. ¶¶ 26, 33.

Thus, without immediate injunctive relief, the harm that HSG will suffer as a result of its loss of Complete Access will be irreparable. *See Blom ASA v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 244 (D.N.J. 2010) (granting injunctive relief for plaintiff and crediting plaintiff's contentions that "its business will be severely disrupted if it is unable to continue to use [defendant's] technology," preventing it from attracting new customers or retaining existing customers); *ADP*, 2020 WL 630554, at *12 ("diversion of a company's customers" may constitute irreparable harm, because the extent of the injury to the business "cannot be readily ascertained") (citing *Fluorarnics, Inc. v. Trueba*, 2005 WL 3455185, at *8 (N.J.

Super. Ch. Div. Dec. 16, 2005)); *see also GCM Partners, LLC v. Hipaaline Ltd.*, 2020 WL 6867207, at *14 (N.D. Ill. Nov. 23, 2020) (granting injunctive relief for plaintiff and crediting plaintiff's contentions that "if Hipaaline cuts GCM out of the Leafwell platform, GCM will lose its relationship with its patients and medical providers, as well as the goodwill it has developed under the Leafwell brand name," and that plaintiff "will lose its extensive efforts to grow and expand in the telehealth industry and be forced to construct or join another online platform").

Further, if PayFirst shuts down the Zota software on August 3, 2025, as it intends to do, HSG's 5,200 salon merchants will lose their ability to process payments or use Zota's sale and marketing features. Without the ability to process payments or conduct other transactions with their customers, HSG's salon merchants will be forced to immediately replace Zota with a competing system, and HSG's revenue stream (and business) will evaporate overnight. Compl. ¶ 8.

Because HSG, as PayFirst knows, cannot implement a workable platform to replace Zota before August 3, 2025, PayFirst's unilateral termination of HSG's license will put HSG permanently out of business. Compl. ¶ 8; Dinh Decl. ¶ 33; *see National Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 229 (D.N.J. 2009) (irreparable harm where defendant's conduct, if not enjoined, "could potentially destroy [plaintiff's] business"); *Sunbelt Rentals, Inc. v. Love*, 2012 WL 82370, at *22 (D.N.J. Jan. 11, 2021) (granting plaintiff's request for a preliminary injunction

on its breach of contract claim, where defendant's continued course of conduct would "jeopardize" the plaintiff's business).

PayFirst's blocking of HSG's access to its accounts and intended termination of HSG's license to the Zota software have also frustrated the Receiver's ability to carry out his responsibilities as court-appointed receiver. Although the Receiver has taken steps to market HSG for sale and has received substantial interest from potential buyers, no one will buy any of HSG's assets (at least for any reasonable sum) while these systemic issues with Zota remain ongoing. Compl. ¶¶ 116, 117.

### C.    The Balance of the Equities Favors Granting Injunctive Relief

Because the Receiver has shown both a likelihood of success on the merits and immediate irreparable harm, this Court proceeds to consider the "[b]alance of [h]ardships," assessing "the potential injury to the plaintiffs without this injunction versus the potential injury to defendant with it in place." *Orient Turistik Magazacilik San ve Tic Ltd. STI v. Aytek USA, Inc.*, 2023 WL 3559049, at *7 (D.N.J. May 18, 2023) (quoting *Issa v. School Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).

This balancing of the equities weighs in favor of granting the requested TRO and preliminary injunction. Denying the requested relief would injure HSG far more than issuing the relief would injure PayFirst. Indeed, in contrast to the

irreparable harm shown by the Receiver above, granting the injunction will not harm PayFirst at all.

As alleged in the Complaint, PayFirst is interfering aggressively with HSG's back-office, customer sales, and technical support operations. PayFirst essentially is trying to steal HSG's customers, by making HSG reliant on PayFirst and giving itself direct access to the customers. For example, as explained above, PayFirst redirected calls made by HSG's Current Providers and others to PayFirst. Compl. ¶¶ 99. In this manner, PayFirst has breached its contract with HSG for its own benefit by seeking to cut HSG out of the business entirely. Such conduct by PayFirst evinces an intent to benefit by disrupting HSG's ability to service customers, by diverting customers to PayFirst, and ultimately terminating HSG's software license so HSG can no longer use the platform at all.

PayFirst, moreover, blocked access to the Zota accounts and threatens to terminate HSG's license not for any legitimate business purpose, but rather to retaliate for the Receiver's decision to transfer certain of Zota's support operations to more appropriate customer-service providers. Compl. ¶¶ 6, 7. Although HSG is no longer working with PayFirst's preferred providers AST and WISE (those affiliated with Huynh, as opposed to Dinh), PayFirst cannot show that this change caused any material interruption in service on the Zota platform and HSG's business overall.

To the contrary, severe disruption has been and is continuing to be caused by PayFirst's decision to cut off HSG's access to the Zota accounts and terminate HSG's license. *See GCM Partners*, 2020 WL 6867207, at *15 (defendant "will not face any harm because injunctive relief would merely require [defendant] to comply with the Agreement's terms, with [plaintiff] agreeing to continue to pay [defendant] for its services over the term of the injunction").

The requested injunctive relief would simply preserve the status quo during the pendency of this action, with HSG's affairs under the Receiver's supervision. *See ADP*, 2020 WL 6305554, at *12 (balancing of harms favored plaintiff where hardship to defendant was merely "requiring him to adhere to the [contract] to which he agreed"); *Inter City Retread*, 2014 WL 12621593, at *4 (granting relief where plaintiff faced "the destruction of its business" whereas "there [was] no clear harm to [defendant] that would result from temporarily enjoining it from terminating the Agreement").

### D.    <u>Granting Injunctive Relief Is In The Public Interest</u>

In this Circuit, "if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Student 1 v. Noem*, 2025 WL 1431186, at *11 (D.N.J. May 19, 2025) (quoting *American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994)). The public interest factor

generally requires the Court to consider "the consequences for the broader public" of issuing the requested injunction. *Legend Biotech USA Inc. v. Liu*, 2024 WL 919082, at *14 (D.N.J. Mar. 4, 2024).

The "specific acts" at issue here—restoring Complete Access to the Zota accounts and preserving HSG's license to use the Zota platform—are in the public interest. The Receiver, with HSG's and Dinh's consent, was appointed by the Wyoming District Court to manage the disposition of HSG's assets and ultimate dissolution in an orderly and commercially reasonable fashion. Compl. ¶¶ 11; Ex. 1 thereto. PayFirst's refusal to permit HSG's Current Providers appropriate access to the Zota accounts is preventing the Receiver from discharging his duties as receiver, and PayFirst's intention to shut down Zota on August 3, 2025—leaving HSG's 5,000-plus nail salon merchants in the dark—will further frustrate the purpose of the Receivership Order. The public has an interest in ensuring compliance with court orders.

Further, courts have repeatedly recognized the public interest in enforcing valid contracts. *See*, *e.g.*, *GCM Partners*, 2020 WL 6867207, at *15 (public interest supports enforcing contracts, "which would include ensuring that, in this case, [defendant] does not pretextually terminate the Agreement"); *Acteon, Inc. v. Harms*, 2020 WL 6694411, at *12 (D.N.J. Nov. 6, 2020) (public has interest in "upholding reasonable, bargained-for provisions of contracts") (citing *Bimbo*

*Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 119 (3d Cir. 2010)). The public

similarly has a clear interest in "safeguarding fair commercial practices," as the

requested injunctive relief would do. *Peoplestrategy*, 2020 WL 7869214, at *9.

## II.    THIS COURT SHOULD ENTER A TEMPORARY RESTRAINING ORDER RESTORING COMPLETE ACCESS TO THE ZOTA ACCOUNTS TO HSG AND THE CURRENT PROVIDERS DURING THE PENDENCY OF THIS MOTION

In addition to entering a preliminary injunction as discussed above, this

Court should also enter a TRO restoring Complete Access to the Zota Accounts to

HSG and its Current Providers during the pendency of this motion. A TRO is

subject to the same Fed. R. Civ. P. 65 standard as a preliminary injunction. *See*

*Koons v. Reynolds*, 649 F. Supp. 3d 14, 22 (D.N.J. 2023). TROs are "stay-put

orders . . . designed to maintain the status quo during the course of proceedings.

They function[], in essence as an automatic preliminary injunction." *Id.* (quoting

*J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 272 (3d Cir. 2002)

(cleaned up)).

Here, a TRO is warranted, because PayFirst's refusal to provide Complete

Access to the Zota Accounts to HSG and the Current Providers has already caused

irreparable harm to HSG, and that injury will only worsen each day that Complete

Access is denied and this dispute remains unresolved. As discussed above, HSG

presently cannot service, support, or retain its existing merchants and cannot

onboard new merchants. Compl. ¶ 85; Dinh Decl. ¶ 19.The Current Providers'

helpdesks have been flooded with calls and complaints, and merchants are leaving. Compl. ¶ 86; Dinh Decl. ¶¶ 32-33. Sales agents have ceased marketing Zota to potential new merchants. Compl. ¶¶ 115; Vu Decl. ¶ 9. *See GCM Partners*, 2020 WL 6867207, at *14; *Blom ASA*, 757 F. Supp. 2d at 244; *ADP*, 2020 WL 630554, at *12 (all granting requested injunctive relief to plaintiff).

Thus, every day that goes by without injunctive relief means (i) more customers that HSG will lose, and will almost certainly never get back; (ii) potential new customers that are not recruited by the sales agents and cannot be onboarded; and (iii) an even more insurmountable customer-service hole out of which HSG and the Current Providers will have to dig when (assuming this Court grants the preliminary inunction) Complete Access is finally restored. In other words, HSG very likely will not survive another few weeks—for this Court to hear and decide the underlying preliminary-injunction motion—and so any relief this Court grants on the preliminary-injunction motion may be rendered ineffectual.

## CONCLUSION

This Court should enter a preliminary injunction, during the pendency of this action, (i) requiring PayFirst to restore Complete Access to the Zota Accounts to HSG and its Current Customer Service Providers, and (ii) preventing PayFirst from terminating the Zota License Agreement.

This Court should also enter a temporary restraining order, during the pendency of this motion, granting the relief set forth in item (i) above.

Dated: June 25, 2025                    Respectfully submitted,

                                        **SCHLAM STONE & DOLAN LLP**

                        By:    /s/ David J. Goldsmith
                               David J. Goldsmith
                               Joshua Wurtzel*
                               Jessica R. Caterina*
                               26 Broadway
                               New York, NY 10004
                               Tel.: (212) 344-5400
                               Email: dgoldsmith@schlamstone.com
                               Email: jwurtzel@schlamstone.com
                               Email: jcaterina@schlamstone.com

                               **MARKUS WILLIAMS YOUNG**
                               **& HUNSICKER LLC**
                               Bradley T. Hunsicker*
                               2120 Carey Avenue, Suite 101
                               Cheyenne, Wyoming 82001
                               Tel.: (307) 778-8178
                               Email: bhunsicker@markuswilliams.com

                               **MARKUS WILLIAMS YOUNG**
                               **& HUNSICKER LLC**
                               Patrick R. Akers*
                               1775 Sherman Street, Suite 1950
                               Denver, Colorado 80203
                               Tel.: (303) 301-3151
                               Email: pakers@markuswilliams.com

                               *Attorneys for Plaintiff Randy L. Royal, as*
                               *court-appointed receiver for HS Group, Inc.*

                               *\*Pro hac vice* application filed
                               simultaneously

34